Good morning, Your Honors. Brian Layton on behalf of the Plaintiff, Neil O'Brien. I'd like to save approximately five minutes for rebuttal, and out of my first ten minutes, I would like to defer the approximate second five minutes to Eugene Volokh. So let me – stop the clock for just a second so we get this set up. So you want to do five minutes, Professor Volokh five minutes, and rebuttal five minutes? Or just tell me what you want to do. I'm not sure I understood. Me five minutes, he five minutes, and then my rebuttal five minutes. Got it. Okay. Keep track of the clock, and let's start it again at 1,500. Bingo. Okay. Thank you. And Mr. Volokh is going to address the videotaping and the public-nonpublic forum issue that apparently Judge Ishii had a problem with. I believe that virtually everything I could say is said in the two briefs. One of the things that I think that has to be stated, I have appeared in front of Judge Ishii numerous times as my home Federal court. When he came out with that ruling, I could not believe it because it was on a motion pursuant to 12b-6, failed to state a claim. And it seemed like he went over the top against my client and supporting the defendants in this case and making generalizations about that he would feel, might feel intimidated to if somebody videotaped him. He didn't want to see the videotape. He didn't allow oral argument. He just came out with this decision. What is the status of the videotape in this case? I mean, it's a little odd. It's referred to in the, repeatedly, obviously, in the complaint, and ordinarily documents that are referred to in the complaint can be looked at as part of the 12b-6. I don't know about videotapes. And also, it in fact wasn't. Is that right? In other words, are you arguing that we should consider, that we should consider the videotape? No. You're not. Okay. No. In his opinion, he said there's nothing on the videotape would change his mind. Because if we're going to. But that doesn't matter because we're reviewing de novo. Right. So I'm asking you, should we be looking at the videotape? You can if you want. Well, I'm asking you whether it would be procedurally proper for us to look at the videotape on a 12b-6. It was on Mr. O'Brien's Facebook page, website. Well, I understand that, but that's. Procedurally. Lots of things are on the Internet that we don't. If it's not on his complaint, what do we care? I mean, this is a 12b-6 motion. Correct. The question attests his complaint. What do we care about the videotape? Well, you shouldn't, but apparently Judge Ishii said there would be nothing on the videotape that would change his mind. If these professors felt threatened and harassed by his activity, then, and it's a subjective determination by them, then there are no First Amendment rights violations my client suffered. And that permeated his entire decision with respect to every action thereafter, the disciplinary hearings, the sanctions imposed, the updated sanctions imposed when the complaint spent in great detail why these defendants were retaliated against my clients because he was a constitutional conservative. And they, as the complaint stated, lack of a better term, they were Marxists, leftists, et cetera, and he did not appreciate the fact that he was being singled out for extraordinary treatment on the campus where Dr. Kuhn, who ended up being the disciplinarian, was asking professors to collect information about Neil O'Brien. And Neil O'Brien hadn't had a confrontation with anybody. He did a public records request, and she wouldn't give him documents. Finally gave him a few, and he realized that what people were reporting to Dr. Kuhn were false. They were not accurate when he would show up at student body meetings. Mr. Layton, we're not trying the case. Layton, okay. Kennedy, we're interested in determining whether there were allegations in the complaint which, under the Iqbal or Twomley case, state facts, not conclusions. Layton, right. Kennedy, from which one could plausibly infer the elements of a claim for relief. Would you kindly go to the complaint and tell us what Judge Ishii did wrong with respect to the complaint? Layton, well, Judge Ishii stated, first of all, we're not reviewing Judge Ishii exactly. Okay. We're doing a de novo. So let's just take the complaint. Have you tell us what the causes of action are? I mean, it seems to me there are variants. There are at least maybe three different First Amendment claims kind of embedded here, and an equal protection claim, and a due process claim. It would help to know what they are and what supports them. The first four causes of action dealt with the situation regarding the May 2nd incident when he was videotaping, or the May 11th incident when he videotaped. When the two professors then called the campus police, they then reported it to Dr. Coons. All right. So is your First Amendment claim – I'm sorry. I'm trying to speed this up because there's not that much time, and you're almost out of the time you said you were going to take. Is your First Amendment claim that maybe they could have disciplined him for what he did, but they really were retaliating for other things he said? Or is it that what he said couldn't, as a matter of the First Amendment, be subject to discipline? Which one is it? We are stating that the – Or the third one, it seems to me, is that because the provision he was charged with is unconstitutionally either vague or overbroad, he couldn't be charged with it. So those are three different things. What we're claiming is that they retaliated against him by filing these claims and going through the disciplinary hearing and charging him with alleged offenses in retaliation for him exercising his free speech rights. That it wasn't objective intimidation or harassment, but it was for retaliation. And the test on a college campus is objective harassment or intimidation. And it has to be severe. Your argument is that it's retaliation because it was not objective harassment. Does your retaliation claim disappear if we were to conclude that this is disciplinable behavior because it is harassment that could reasonably induce fear? I don't believe the entire thing would go away, because then what happened at the disciplinary hearing and how they treated him then, and then what happened thereafter in further disciplining him that had nothing to do with what originally occurred on May 2nd, May 11th, I mean, with the professors. What we're saying is that what he did was freely protected speech. What they did was to punish and silence him, which we alleged in factual detail in the complaint, based upon his views, where he objected to so much of the ---- But you do not need to prevail on both of those grounds, do you? In other words, it could be that it wasn't protected speech, but they still retaliated against him. They wouldn't have disciplined him otherwise. So that's what's confusing to me. I mean, you're meshing the two together, but you don't need to mesh the two together, do you? What I'm saying is he engaged in fully protected free speech on a college campus. So that's your argument. It's not that you could look at it as contact and as harassment, but they really only disciplined him because of his retaliation. You're not saying that. I'm saying both those. You're well over your time. Why don't we hear from Professor Volokh, and we will make sure you have some time for rebuttal. Your Honors, I'm Eugene Volokh. I'm here representing AMIKI, Foundation for Individual Rights in Education, Student Press Law Center. Video recording, as this Court has mentioned and other courts have also held, is presumptively protected First Amendment behavior, especially when it's of public servants. Now, to be sure, like other kinds of First Amendment-protected behavior, it might be limited in, for example, law. Well, but what happened here, and I don't know what the status of the tape is. I will confess to having looked at it online. I don't know if I'm supposed to take it and look at it or not. But even as described, he went there with the videotape and the first incident. And each of the professors said, I don't want to talk to you. Stop videotaping me, and I don't want to talk to you. And then he said, I'm going to videotape you anyway, and I'm going to talk to you, and I want you to answer me even though you said you're not going to, right, even though you asked me not to, essentially. I mean, is that essentially accurate? And I don't know. I mean, you can't really tell from the complaint whether he was inside the door or outside the door. Maybe that would matter. But in any event, he was in the doorway of offices in both cases. So whatever right there is to videotape, assuming nobody had complained about it, once they said, I don't want you videotaping me, does he still have a right to videotape? Your Honors, in a nonpublic forum or a limited public forum, this would be one or the other of those, it would be permissible for the school to have a policy that says you cannot video record without people's permissions. It would likely at least be permissible. It would be judged under the viewpoint neutral and reasonableness standard. Or you have to stop video recording the moment people ask. But there was no such policy here. The policy here was the policy in 41301, which bars conduct that threatens or endangers health or safety by behavior including intimidation or harassment. And the term harassment has many different legal definitions. But we know in this case that it's limited to that which is threat, which is related to health or safety. Your Honor, there are two components to this. It has to be threatening or endangering health or safety. And it has to also be intimidation or harassment. So why isn't the health or safety enough of a limitation on what harassment means? Now, whether that's met here is another question. But in terms of the facial provision, why isn't it enough? Your Honor, there are some definitions of harassment that refer to threats to health or safety. But under those definitions of harassment, this behavior isn't harassment. So then I'm wondering, I think that's possibly true, at least the first time around. But is he arguing that exactly? I mean, that's why I was trying to get him to clarify his First Amendment argument. Your Honor, my understanding is at least part of the argument is that while this behavior perhaps might be restrictable through a carefully crafted rule, there needs to be such a rule that puts people on notice that says this kind of video recording is impermissible. And the prohibition on threatening or endangering health or safety through intimidation or harassment is not, at least in this case, such a rule. It does not — first of all, despite the limitation, it is not clear enough as to what it prohibits. But under any interpretation known in the legal system of intimidation or harassment — So let me make sure that I understand your argument. Your argument is not that your client has a constitutional right to do what he did, but rather that the prohibition is insufficiently clear to show that he was not permitted to do it, and therefore it cannot be invoked against him. Is that the argument? Your Honor, Mickey's argument is that this kind of behavior, while presumptively protected by the First Amendment, might be restrictable by narrowly crafted rules. Just this is not a clear rule. An analogy is clear. But you just used the word might. So you're saying that this is something that perhaps couldn't be restricted? Are you going to take a position on that one way or the other? Your Honor, it probably could be restricted through a viewpoint-neutral and reasonable  do so. I want to make sure I've understood your words properly. That is to say, as I just understood what you said, you can correct me if I misunderstood, this is not constitutionally protected behavior. You say it could be prohibited. And the issue is whether or not this is sufficient to prohibit it. Your Honor, this is behavior that is within the boundaries of the First Amendment but could be restricted by a narrowly crafted rule. Well, let me make sure I understood what you said then. Let me say it again. Yes. That this behavior can be prohibited. That is to say it's not in itself constitutionally protected behavior. The only issue is whether or not it can be prohibited by this particular regulation. Is that your argument? Your Honor, that is the case. And Cohen v. California, I think, offers the answer is yes. I think I heard you say yes. Yes. Okay. And Cohen v. California offers a possibly helpful analogy. The jacket that Cohen wore in Cohen v. California into a courthouse might well have been restrictable through a narrowly crafted rule that prohibits vulgarities in courthouses, courthouses being nonpublic fora or limited public fora. That might be, therefore, restrictable. But the Court said there's nothing in this particular rule that limits it to courthouses and that is narrow enough and clear enough. But leave the videotaping out for a moment. I know that's what you want to talk about, but that isn't all he did. He insisted on talking to somebody who had said that in their office who didn't want to talk to him. In general, there is no right to have anybody answer you, right? Your Honor, that is correct. And so he had — did he have any right once he had asked this question to — and been told that the person didn't want to talk to him and didn't want to answer to continue to do it? Your Honor, again, I think that is behavior that is presumptively covered by the First Amendment but could be limited through specifically narrowly crafted restrictions. You know, you keep saying presumptively protected by the First Amendment, but then when you answer my question, you say it's not protected. And the only issue is whether or not this particular rule prohibits it. What do you mean when you say presumptively protected by the First Amendment when you say it's not protected? Your Honor, I think a great deal of First Amendment protected behavior may be punishable by particular kinds of rule. An example is flag burning. If there is a — if somebody is burning a flag in a public place and there is a content neutral clear rule that says no burning anything in a public place, it could be restrictable by that kind of rule. But if there is a rule that says no demonstration — But isn't there some point at which sort of ordinary civility takes over, i.e., ordinarily if people don't want to talk to you, you don't have — they have a right to tell you to not talk to you? Your Honor, I think that's quite right as a matter of ordinary civility norms. But on a college campus, there have to be clearer rules than just don't be uncivil or don't be annoying. One such possibly clear rule might be once some — But the difference here, of course, is that we were talking about somebody who was in their — the person he was talking to was in their office, right? Whether he was in their office or not, we don't really know. But that person was in their personal office. And it seems unlikely to me, at least, that there's a First Amendment right to go barging into somebody's office and talk to them after they've told you — or next to their office and talk to somebody who doesn't want to talk to you, who tells you they don't want to talk to you, without regard to whether there's a rule or not a rule. I don't know what — I understand that there's broad First Amendment rights in universities, and there should be. But at some personal interaction level, why don't ordinary rules of personal interaction prevail with regard to the fact that people in their offices are entitled to say, I don't want you in here, I don't want you to talk — I don't want to talk to you? Your Honor, if the university were to have a rule that says that this kind of behavior is impermissible and says it clearly enough, that would be a constitutionally permissible rule. To offer another example, there's a case, Rowan View Post Office Department, which says all of us have the right to say to a mailer, look, stop mailing things to me. And if the person keeps mailing them, then that's actually a Federal crime. That's Supreme Court — But why isn't the rule that we have here sufficient to accomplish the purpose to which the university seeks to put it? And that is to say, the professor is there in the office. Someone who is clearly unwelcome comes, says, I'm going to videotape you. The professor says, don't videotape me. Please leave. The person refuses to leave. And at that point, the professor calls the police. Why does not that come within a reasonable reading of the regulation? Your Honor, for two reasons. One is we don't think that this endangers health or safety, or at the very least if there was such evidence. Well, is there some idea that it could reasonably be interpreted by the professor subjected to this behavior as threatening health or safety? Your Honor, we don't think that it would be, absent more factual evidence that the person was making threatening gestures or something like that. At a motion-to-dismiss stage, given the complaint, it seems that there is enough of an allegation here that this was behavior that might be kind of annoying journalistic behavior, annoying information-gathering behavior. But we then have a proceeding at which the university concludes that this was behavior that comes within the scope of the regulation. So it's not as though we're forced to rely solely on the allegation of the complaint. We know what the university concluded it was. Your Honor, under both Corporation v. Consumers Union, even judgments of district courts and of juries would be subject to independent review by this court. I understand that. So, likewise, the judgment of the hearing officer saying that this was reasonably perceived to the extent that such a judgment was made that it was endangering health or safety, that, too, would be subject to independent review. But I think we get some sense of the meaning of the regulation from what happened. Your Honor, it may be that they're trying to reinterpret the regulation, not just to cover it. Well, we have a very clear interpretation of the regulation. They say this was punishable behavior under the regulation. Well, Your Honor, I don't think there was any way for Mr. O'Brien to have known this up front, especially since Fresno State actually has a harassment policy that we cite in our brief that's on its site that actually defines harassment as something quite different. It defines harassment as hostile environment, kind of bigoted harassment based on an individual's protected status. So to the extent that they're interpreting it, before this incident they actually interpreted harassment in a very different way. And Mr. O'Brien had no way of knowing, just like Mr. Cohen had no way of knowing that the California law would be somehow specially applied to courthouses, Mr. O'Brien had no way of knowing that this, his behavior, which is kind of par for the course. This is what Mike Wallace used to do for 60 Minutes, albeit much lower budget. But was he a journalist? By the way, I mean, I didn't understand that he – my understanding is he was doing this self-protectively, that he said in his complaint, I believe, I started videotaping because these people were, you know, restricting my rights and denying what I was saying, so I wanted to prove it. But he never said I was doing it for the world at large as opposed to to protect myself, did he? Your Honor, my understanding is that he was, among other things, he saw himself as kind of this citizen muckraker who would find this information and would post it on YouTube for the world to see, go viral, everybody's dreams. This Court in Obsidian Finance v. Cox, I believe just last year, specifically held what the Supreme Court has long suggested in many ways, that the First Amendment rights are not limited to the institutional media, and that people who are not professional journalists who are just as protected by the First Amendment. One, by the way, and then I think you're very out of time. I'm so sorry. Is there or is there not a California – I know there's California restrictions on surreptitious videotaping, but is there any California law forbidding nonconsensual open videotaping? No, Your Honor. The California statute prohibits audio recording, which of course this included. It is only limited to – excuse me. It is only limited to audio recording of confidential communications, which are communications that under the circumstances the person would reasonably expect to be confidential. A conversation that is in fact seen as offensive by people precisely because it is prominently being recorded would not be seen as a confidential communication that a reasonable person would expect to be confidential. Now, we've taken you over time, but I've got – I'm still sort of working on this question of retaliation. I'm not sure I understand the argument about retaliation. I tried to pin it down. Assume for the purpose of my question that the behavior that he's engaged in violates the regulation and that the regulation can permissibly be enforced against him. This is assume for the purpose of the question. I'm not asking concession. Is it retaliation to enforce the regulation even if these two professors don't like what he said? Your Honor, I think the answer to that would be given by the Mount Healthy Doctrine, which came up in the government as employer context, but will apply equally here, that if for the purposes of this question his behavior is not constitutionally protected, but there is reason to think that maybe the sanction was imposed because of other speech that was constitutionally protected, then the question is whether the same sanction would have been imposed but for that other protected speech. And that's the Mount Healthy City. With the burden on the defendant at that point. I believe the burden is on the – yes, exactly, on the government to show they would have reached the same result. I should note also that the nature of the discipline might be relevant here. Here the discipline itself involved a speech restriction. One of the things that as a result of what happened to him he couldn't do is hold office in a student organization, which is clearly First Amendment protected behavior. And if it is potentially a retaliation claim, how do we find – how do we put that into a sort of a broader context? This is quasi-prosecutorial, of course. It is not criminal law, nor is it in our prosecutor. But do we inquire at all with respect to retaliation when we look at prosecutors? I don't know of a case in which we've done that. Your Honor, for criminal prosecutions the answer is no. But when it comes to government employer actions with regard to employees, the answer is certainly yes. It is not an employee either. So those cases are also to some degree off to one side. Your Honor, that is correct. We think that this is a closer matter. It's true the relationship is not employer-employee, and his rights, in fact, are greater than the rights of a typical government employee. But we think that Mount Healthy would probably be the closer analogy. It's also in the civil context, government acting in special capacities through its kind of administrative functions. Thank you, Your Honor. I'm sorry to have taken up the extra time. Let's hear from the other side, and we will give a chance to revise. I'm sorry. May it please the Court? I'm Molly Murphy, counsel for the appellees who are administrators and faculty members at Fresno State University. This case is an internal university matter. There was no constitutional right violated. Mr. O'Brien was never suspended, expelled, or prevented from attending.  Pardon me? Yes, he was subject to discipline. But he was subject to discipline. He was subject to minor disciplinary sanctions. Well, you can call it minor, but... I think the district judge has to be wrong about the question of whether there was sufficient discipline here for purposes of a retaliation claim, doesn't he? Well... I mean, you're characterizing as minor discipline, but he wasn't able to be an officer of a club he wanted to be an officer for. He wasn't able to run for student government, and he was physically restricted by where he could go. I mean, that's certainly enough that somebody who knew that might happen to them would chill their First Amendment, their speech activity, isn't it? Well, Your Honor, in terms of First Amendment retaliation, the Corrales test is not met here, mostly because... The which test? The Corrales test, Corrales v. Bennett, mostly because his admitted conduct, his own allegations... All right. But I'm asking you something. Sure. I just was trying to get one thing out of the way, which is the district judge seemed to say that this discipline wasn't even enough to constitute retaliation, and I don't see how that can be. Can you, if you, so do you, are you supporting defending that proposition? Well, Judge Ishii did make that finding that... No, we did. I'm asking you whether you agree with me that that can't be right. Frankly, Your Honor, I would say that that finding really doesn't matter because the third prong of the test is so obviously not met for a First Amendment retaliation claim. Okay. And Kelly White's obviously not met. I'm sorry? Why is it obviously not met? Because Mr. O'Brien's own allegations are that there was a hearing at the university and a hearing officer found that two professors reasonably felt unsafe because of the conduct that Mr. O'Brien admitted to doing. And therefore... And the sanctions were... And so were bound by that? These are his allegations... Doesn't get to try that in federal court? I'm sorry, Your Honor? Doesn't get to try in federal court the question of whether that was so? Well, but, Your Honor, he admitted that there was a finding at the university that his conduct reasonably made the professors feel unsafe. Okay. There was a finding, but so what? Well, in this circuit, the courts give substantial deference to the universities to make decisions. Schools have deference to make decisions about safety. How could he have made that decision without seeing the videotape? How could the... Apparently, the people who made that decision didn't see the videotape. That is the allegation. And the district judge... Well, I know that's the allegation. We're operating on a complaint, okay? Right. And the district judge didn't see the videotape. Not as far as I know. Right. And so how can anybody tell? I mean, sure, the world used to go out before videotapes, but once you have the videotape, to refuse to look at it to see whether it was in fact reasonable seems like a difficult proposition. Well, they certainly got testimony from witnesses at this hearing. Mr. O'Brien has admitted that he confronted Professors Lopez and Torres separately in each of their offices. He has admitted he would not leave until each of them separately called police. Well, as I understand it in the complaint, he said he asked them twice. Essentially, he asked them once. They said, stop videotaping. I don't want to talk to you. He asked them a second time, and then they went and called the police. So it was twice. Is that right? Well, he also alleges in his complaint that he insisted that they, you know, he didn't just stop questioning them when they said stop. No, he asked them a second time. He insisted. He remained. He was videotaping them. He was questioning Dr. Lopez about a poem that she had absolutely no connection to. He just felt like questioning her. That's intimidation. Is your proposition that the regulation requires that he threaten health or safety and that that's a limiting interpretation on the harassment and that he was threatening health or safety? Well, what I'm saying is there was a hearing, and at the hearing there was a finding that it was reasonable for the professors to feel their health or safety was threatened. So he got a hearing. So your legal position is that we're bound by that finding? Well, my legal position is that he's failed to state a claim under the Ashcroft standard. Let me ask you about that. And there's a question that Judge Fletcher brought up, and I don't know if we got a straight answer to it. Let's suppose that he violated the university policy. Right? If the motivation for bringing the action, which ended in a sanction against him, was alleged to be motivated by the defendant's wish to squelch his viewpoint, right, would your position be that he has not stated a First Amendment retaliation claim? Yes, Your Honor, it would. Because he has admitted in his allegations to conduct that stepped over the line, and that was found to reasonably. So if the motivation for bringing, let's suppose the same thing happened the day before to somebody who had exactly opposite political views to Mr. O'Brien, and the school took no action, right? In O'Brien's case, because of his political views, the university were to take action. In that case, you say it doesn't make any difference, even though they were motivated because they didn't like his viewpoint, then because he admitted that he harassed them, then he does not have a First Amendment cause of action? Well, he's admitted to conduct that no other student's admitted to. It could be that a student. That's what we're getting at. Right. If the motivation is tainted for the prosecution, does that taint the prosecution? Well, I think what needs to be looked at here is the other end of it. Did the conduct of the case? Perhaps you do, but I don't. So would you answer my question? Yes. Well, I would say it would depend. Say, for example, a student appeared at the office. If it depends, if it depends, and I take your word that it depends, then the question is whether the complaint alleges facts from which one could have a connection to the bringing of the school prosecution. Are you claiming that this complaint does not state those facts? It does not state the facts sufficiently. Let's go over those then. Let's take a look at page ER 53. He alleges that Dean Kuhn's requested other students to gather complaints about O'Brien. What does that have to do with his actions in the as to these two offices? Doesn't that infer that Dean Kuhn's wants to collect evidence of the viewpoint of Mr. O'Brien? But there's no allegation that any evidence collected, you know, came to anything. It all came down to the events of that office. We're talking about motivation. We're talking about motivation. Then the professor's e-mails to the university president that referred to O'Brien's website and asked that some action be taken against O'Brien. The website wasn't walking into the two offices. What were they after? Is there some inference that can be drawn from this allegation that perhaps they were after him because of his viewpoint? Well, Your Honor, I would submit that if there had been, say, a left-leaning student who was hysterical with happiness over this phone call. Can you answer the question I asked without going to a simile? Well, Your Honor, I think the way that these allegations are set forth, it's hard to tell, like, at what time, you know, the investigation occurred.  The allegations were all that these e-mails were sent out before he walked into those two offices. There's also the removal of O'Brien's posts on the university's Facebook by some unidentified agent of the university. And an exchange between Professors Lopes and Torres that they wanted, quote, wanted posters, unquote, of O'Brien. Doesn't that sort of indicate that they're after him because of his views? Your Honor, I think it's the manner in which he's expressing his views, not his views. He's admitted to this overbearing, intimidating conduct. He hasn't expressed his views yet because this conversation between Lopes and Torres took place before he tried to barge in. He overheard them talking. That's an allegation. It may not be true. But my point is, with these allegations, isn't there sufficient factual material under Iqbal to see that there is a viewpoint, discrimination, motivation for the bringing of an action which may be sufficient under the rules that we've stated? Now, we have lots of cases. I'm thinking of Al Kidd, for instance, where the motivation for bringing federal criminal actions is not relevant to the validity of the criminal action brought. But does that rule apply here on First Amendment grounds? Well, generally, Your Honor, criminal law is more strictly applied than regulation. I mean, a school deserves some deference to make decisions about how to make its campus safe. Is it accurate? Well, I don't know if it's accurate. Is it accurate that the complaint says that in the hearing he was not allowed to put on any evidence regarding motivation? Is that right? Your Honor, that's what the allegation is, and that's, frankly, all that I know at this point. So on that issue, as to whether this was retaliatory, the university's conclusion must be entitled to no deference, no credibility at all, because they didn't decide that. Well, Your Honor, under the U.S. Supreme Court has said that students are entitled to some kind of notice and some kind of hearing. That's not what I'm asking you. Just listen to the question, okay? I'm asking you whether — I understand that, but that doesn't tell me whether on the issue that Judge Bea was just asking you about, i.e., was this retaliatory for his views, even if it were otherwise a valid discipline. The hearing had nothing to do with that. It didn't consider it, according to the complaint. It didn't consider it, it didn't allow evidence, and it didn't make a decision. Is that correct? Well, according to the complaint. Okay. I would like to address qualified immunity. I'm kind of running out of time. Okay. But we'll make sure you get a chance to say what you need to say. Okay. But all three of us are working on the same problem here for the moment, and I want to phrase it in a slightly different way, not by a hypothetical, which is how Judge Bea did it, but by what appeared to be the alleged facts here, which is to say — I mean, Judge Bea is clearly going after those allegations, but I'm going to stick only with them for the moment. It's pretty clear that prior to coming to these two offices and attempting unsuccessfully the videotape, he engaged in constitutionally protected free speech. Correct? Correct. And the district court's all found. Right. So the question that I'm about to ask has nothing to do with whether or not coming to the doorway and attempting the videotape is protected by the First Amendment, but rather, given that we have a prosecution under the administrative rule and then discipline imposed under the administrative rule, is it relevant to a retaliation claim the motivation for bringing this disciplinary proceeding and then imposing the degree of discipline that was imposed? What happens if he can persuade a judge or a jury that bringing the disciplinary proceeding and then imposing this degree of discipline was motivated in substantial part by their disagreement with his political view? Does that state a cause of action under the First Amendment? Well, not in these circumstances, for one thing, because qualified immunity would apply. No, qualified immunity is off the table for this purpose. Okay. Qualified immunity assumes a constitutional violation. I'm asking about whether there was a constitutional violation based on what I just said. No, because, again, he's admitted to conduct that's made people feel unsafe. You're missing the point of the question. The question is not whether or not this is disciplinable conduct. I'm assuming that it is. Right. The question is if the motivation for doing this to him is disagreement with his previously exercised First Amendment rights. Is that forbidden retaliation? Well, I don't know. It can't be because he's admitted to engaging in conduct that violates the regulation. So if there are you also said that if there were, and it has to be the case, that if there were five people in a day who came in and did exactly the same thing, disciplined conduct which could have been disciplined, and they only disciplined him, then he could, he would have a cause of action for retaliation? No? Well, he may. Okay. But again. So the question is only really whether his evidence is strong enough to get him off the page of the complaint as to essentially that same allegation. You know, I mean, unless you think you always need comparators, he's alleging a state of mind. He has some facts to support it, i.e., that they really didn't like what he was saying and that they were trying to, they were talking about putting posters up and they were talking about getting people to make complaints and so on. They were trying to get him to stop doing the protected activity. And the question is, has he made enough of a connection to this disciplinary proceeding? Again, I don't see the connection. I mean, sure, he engaged in previous First Amendment activity. But then to have a specific incident where not one but two professors separately call police, I mean, the university can say, well, but he's engaged in First Amendment activity in the past, so we better not do anything about it, even though we have two professors. But if there was some encouragement of people to complain about him, then that could be why they were complaining about him, as precipitously as they were. Well, we only have the allegations of the complaint to work with, Your Honor, because it's... All right. What about qualified immunity? As to that issue, let's stick to the retaliation issue, okay? Okay. Well, the test for qualified immunity is... We know the test. Okay. All right. Well, again, Mr. O'Brien confronted two professors separately in their offices with... Now, I want to talk about the retaliation issue. You really have to stick to where we are, or you're not going to help yourself or us. I want to know whether, with regards to the retaliation issue, the police would — if it were otherwise established that the reason why they called the police on him was because they didn't like his views — all right, let's just make it bald — would they be entitled to qualified immunity? Again, that's not what was alleged, but... Not what was alleged? Yes, they would be... Wait a minute. What do you mean it's not what was alleged? Because he admitted to the conduct that made them feel unsafe. He admitted there was a fine... All right. Let's assume there was conduct that made them feel unsafe. But the reason they called the police was because they didn't like his views and they were trying to get him in trouble. But then he goes on to contradict himself in his allegations and say there was a finding that he made them feel unsafe. After a hearing... They're not being helpful. There was no law specifically on point, clearly established, to make any of these faculty members or administrators understand that what they were doing would have violated Mr. Bryant's First Amendment rights. The law on retaliation in return for exercising protected First Amendment rights is longstanding. The Mount Healthy decision to which we were referred is 1977. I mean, this notion about retaliation in return for or as a result of exercising unconstitutionally protected rights is longstanding. So if we're talking about was the law about retaliation well established, the answer is yes. But there's no law that says... I mean, if you look at it from the professor's perspective and the university's perspective, they have to think about the safety of the people who are there. There was the Souters case saying that... Souters versus Lucero saying, you know, the university doesn't have to make every area on campus available to every person. They've got safety complaints. If the university hadn't done anything about it, you know, maybe they would have faced action from the professors saying that they're in an unsafe work environment. That is why this is a hard case because there seems to be allegations of fact on the one side that would lead one to suspect that the reaction was due in part to disagreement with what he had previously said. On the other hand, I can understand the standpoint of the professors who feel threatened and the discipline against someone who has threatened them. So, I mean, this is a hard case for precisely that reason. I get it. But it doesn't mean that there was no motivation in both initiating the disciplinary proceeding and then imposing this punishment that that was entirely divorced from any distaste for his previously expressed views. That's why this is hard. Does the Court have any further questions? Thank you. All right. Thank you. Well, we've taken everybody over time. Why don't we put three minutes on the clock for rebuttal? With respect to one of the questions you asked, in every employment termination or retaliation claim, the employer may come up with a motive for doing something that is authorized, but if the underlying motive was something unauthorized, the Court's always found that to be a problem. Secondly, the disciplinary ---- Are you ---- this is something of an unfair question, but are you aware of the Supreme Court opinion in I think it's called Moss v. Wood about ---- which was really kind of close to this on the retaliation issue. It wasn't in the university setting, but it was whether ---- it was that the allegation was that the Secret Service had allowed certain protesters who were anti-Bush to be closer than the ---- to be further away from the President than the pro-Bush people, and it was on a 12b-6, and it was on a, you know, a viewpoint discriminatory point. And they did find that qualified immunity applied. So why wouldn't this be the same? Well, qualified ---- Well, based on this complaint, that what they were doing, that there was no justified reason for what they did. Well, first of all, it's been known for decades that you cannot retaliate against somebody ---- I know that, and that's what I wrote in the opinion. I could overturn it in Moss v. Wood, so. Okay. So a couple of things. Nowhere did the regulations of the school ban videotaping. Secondly, if you look at the complaint, E.R. 58, paragraphs 58 and 59, there's no allegation that he's threatened them at all. He said, did you approve of the poem that is in that Hispanic insert in the Daily Collegiate? Well, I suppose they ---- but he did say that he was standing there in their doorway and when they asked him to be quiet and go away, he refused to do it. The question is ---- And so he picked up the phone. That much is true, right? They picked up the phone and he left. And he went down to Lopes's office and he wasn't going to bother her. Well, didn't they close the door on his face at that point? Yes. Okay. So he didn't have any choice. He was outside the door. I'm sorry? He didn't step in. They have an open-door policy. He didn't open the door to go in. Okay. The door was open. In fact, Torres was talking to somebody else in his office. Okay. He went down to Lopez. She did the same thing. He walked away. If somebody walked into my office, I sometimes leave the door open, and asked me a question, I said, I can't talk to you, and then said with a videotape I insist on talking to you, you don't think I could feel threatened? Well, in your office here, of course. Yes. They wouldn't allow anybody in there. But in this, it's an open-door policy. It was so brief. When Lopez at the disciplinary hearing, when O'Brien at the disciplinary hearing wanted to show each of Lopez and Torres the videotape to ask them questions, the hearing officer refused to allow them to play the video. We had a witness there from the campus police department who watched the video, realized that the, and it's in the complaint, that the complainant's testimony or statements to the campus police were false, that it was not intimidation, it was not harassment. He was prepared to testify at the hearing. You're talking about due process claims, but you didn't raise those in your opening brief. In my opening brief I did, yes. Only in the statement of facts. You didn't argue them. No, did I due process at the hearing? Yes. Yeah, we argued that. Not that I could see. Let me go back to this question of somebody coming to the office, the door of a professor, and then insisting on a right to videotape and leaving only when the police are called. I don't think it's objectively unreasonable for the professor in that circumstance to feel threatened. I mean, that's an extraordinary thing to happen in the life of a professor. We're now not talking about judicial offices, I'm talking about professors' offices. That does not happen with any frequency in the life of a professor. These meek and mild-mannered, wimpy old professors, somebody shows up with a videotape and says, I'm going to videotape you, oh, maybe it's eggshell head, maybe they're particularly fearful, but I wouldn't be surprised if they were afraid. Camera crews are shoving videotapes in front of people all the time, whether they walk out of the courthouse, whether it's on campus. It is whether or not it violates, would an objective person feel harassed or intimidated, especially when it was just for a bare moment that the videotape was running and the person was there? And he was not loud. We explained that. He was not profane. He did not threaten them. He said, did you approve of the poem in this newspaper? Okay, got it. Okay, thank both sides for their arguments. O'Brien versus Welty submitted for decision. The last case on our argument calendar this morning, Allen versus Rivera.
judges: Fletcher, Berzon, Bea